**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MARKIST BANNISTER,
U.S. Federal Medical Center Devens
42 Patton Road
Ayer, MA 01432

       Plaintiff,

    v.

UNITED STATES PAROLE COMMISSION,
J. PATRICIA WILSON SMOOT,
PATRICIA K. CUSHWA,
CHARLES T. MASSARONE,
United States Parole Commissioners
90 K Street, N.E.
Third Floor
Washington, DC 20530

       Defendants.

Civ. No. _____

COMPLAINT

## COMPLAINT

Plaintiff Markist Bannister ("Mr. Bannister"), by his undersigned counsel, brings this Complaint against Defendant United States Parole Commission ("Commission"), and its Commissioners, Chairman J. Patricia Wilson Smoot, Vice Chairman Patricia K. Cushwa, and Commissioner Charles T. Massarone, and hereby alleges as follows:

## INTRODUCTION

1.    Markist Bannister is a prisoner at Federal Medical Center Devens ("FMC Devens") in Ayer, Massachusetts.  For 19 years, Mr. Bannister has been serving a sentence of 5 to 30 years for a robbery and aggravated assault that occurred in 1998 when he was only 19 years old.

1

2.      For 14 of the 19 years of his incarceration, Mr. Bannister has sought parole through a process that provides no accommodations for those like him who suffer from mental and cognitive disabilities.  The predictable, and unlawful, result of the failures of the parole system is that Mr. Bannister has been denied parole repeatedly.  This lawsuit seeks to remedy that injustice.

3.      Mr. Bannister suffers from paranoid schizophrenia—a severe mental illness that affects a person's thoughts, feelings, moods, and overall functioning.  He also suffers from significant intellectual disabilities, evidenced in part by his documented low IQ score.

4.      Mr. Bannister has applied for parole seven times since April 2004, the date of his initial eligibility for parole.  But those efforts have been for naught because the U.S. Parole Commission's lack of accommodations made it effectively impossible for Mr. Bannister to obtain parole—as it similarly disadvantaged other parole-eligible prisoners with similar disabilities.

5.      Even when Mr. Bannister maintained long stretches of incident-free behavior and completed hundreds of hours of programming, as required by the Commission in his various parole hearings, he was then denied parole in subsequent hearings.

6.      While the Commission gave a variety of justifications for denying Mr. Bannister parole seven times, those reasons effectively can all be traced to a single cause: Mr. Bannister has mental and intellectual disabilities, yet the Commission did not accommodate those disabilities in judging his fitness for release.  The Commission provided Mr. Bannister no accommodations that would mitigate the effects of his disabilities and allow his consideration for parole in the same manner as those without disabilities.  Indeed, not only has the Commission failed to make any accommodations for his mental and cognitive impairments, but the

Commission has also cited conduct caused by such impairments as a basis for denying Mr.

Bannister parole.

7.      In other words, the Commission has denied Mr. Bannister the benefit of parole on

the basis of his mental and cognitive disabilities.

8.      Without accommodations to properly account for those disabilities in the parole

guidelines or in the Commission's application of the parole guidelines, Mr. Bannister has been

denied parole and will not be able to obtain parole before his 30-year maximum release date of

February 17, 2029.  The failure to address Mr. Bannister's disabilities effectively denies him

parole, and that unequal treatment violates Section 504 of the Rehabilitation Act of 1973.  29

U.S.C. § 794.

## THE PARTIES

9.      Plaintiff Markist Bannister is a resident of the District of Columbia who is

currently serving a sentence at FMC Devens, located at 42 Patton Road, Ayer, Massachusetts.

10.     Defendant United States Parole Commission is a federal agency located in the

District of Columbia.  The Commission exercises authority over D.C. Code offenders pursuant to

Section 11231 of the National Capital Revitalization and Self-Government Improvement Act of

1997, 111 Stat. 251, 745-46.  The Commission has the "sole authority to grant parole, and to

establish the conditions of release, for all District of Columbia Code prisoners who are serving

sentences for felony offenses, and who are eligible for parole by statute."  28 C.F.R. § 2.70(b).

11.     Defendant J. Patricia Wilson Smoot currently serves as Chairman of the

Commission.  Commissioner Smoot has served on the Commission since September 16, 2010

and was named as Chairman on May 29, 2015.  Commissioner Smoot is being named in her

official capacity as Chairman of the Commission, which is located in Washington, D.C.

12.     Defendant Patricia K. Cushwa currently serves as Vice Chairman of the Commission.  Commissioner Cushwa is being named in her official capacity as Commissioner of the Commission, which is located in Washington, D.C.

13.     Defendant Charles T. Massarone currently serves as a Commissioner of the Commission.  Commissioner Massarone is being named in his official capacity as Commissioner of the Commission, which is located in Washington, D.C.

## SUBJECT MATTER JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this case because it presents a federal question under the Rehabilitation Act of 1973, 29 U.S.C. § 794.  28 U.S.C. § 1331.

15.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because the Commission is located in this judicial district.

## PAROLE GUIDELINES FOR D.C. CODE OFFENDERS

16.     In reviewing parole applications by individuals who committed a D.C. Code offense between March 4, 1985 and August 4, 1998—a group that includes Mr. Bannister—the Commission is obligated to apply a set of parole-consideration guidelines promulgated by the Commission's predecessor, the D.C. Parole Board, in 1987 ("1987 Guidelines" or "Guidelines"). Paroling, Recommitting, and Supervising Federal Prisoners: Prisoners Serving Sentences Under the United States and District of Columbia Codes, 74 Fed. Reg. 58540 (Nov. 13, 2009) (codified at 28 C.F.R. pt. 2).

17.     Mr. Bannister is properly evaluated under the 1987 Guidelines based on an initial offense date of December 18, 1997.

18.     The 1987 Guidelines provide guidance on an individual's suitability for parole through a point system that considers factors such as offender history, offense characteristics,

and prisoner's behavior, among other factors.  A true and correct copy of the 1987 Guidelines and relevant Policy Statements as adopted by the Commission is attached as **Exhibit A**.

19.     The 1987 Guidelines direct the Commission to calculate a prisoner's "Salient Factor Score" ("SFS") to determine whether a prisoner is suitable for parole.  Under the Guidelines, the Commission considers criminal history factors such as an individual's prior convictions, prior commitments of more than 30 days, age at time of current offense, recent commitment-free period, status of prisoner at current offense, and history of heroin or opioid dependence.

20.     The SFS score is then used to determine an individual's risk category. The initial SFS calculation places a prisoner in the low risk, fair risk, moderate risk, or high risk category.

21.     Once the Commission establishes this initial risk category, it considers additional pre- and post-incarceration factors to determine an individual's suitability for parole.  Pre-incarceration factors examine whether the prisoner's offense included violence, a weapon, or crimes involving drug trafficking, and whether the individual has prior convictions in any of these aggravating categories.  Post-incarceration factors examine whether a prisoner committed serious disciplinary infractions or demonstrated sustained achievement in prison programming or work assignments.

22.     With the initial risk category serving as a baseline (low risk, fair risk, moderate risk, or high risk), aggravating or mitigating factors from the pre- and post-incarceration assessments adjust the score positively or negatively. The resulting final score, the prisoner's Point Assignment Grid Score ("Grid Score"), can range from 0 to 5.

23.     If a prisoner's Grid Score is between 0 and 2 at an initial hearing, the Commission presumes that the prisoner is suitable for parole.

24.     After the initial hearing, a prisoner is presumed suitable for parole at a rehearing if his grid score is between 0 and 3.  In the case of a parole rehearing, the 1987 Guidelines state that:

> In determining whether to release on parole an adult or a youth offender appearing before the board at a parole rehearing, *the Board shall take the total point score from the initial hearing* and adjust that score according to the institutional record of the candidate since the last hearing pursuant to Appendix 2-2. The Board shall then take one of the following actions:
>
> (a)     IF POINTS = 0-3: Parole shall be granted at this rehearing with highest level o[f] supervision required; or
>
> (b)     IF POINTS = 4-5: Parole shall be denied and a rehearing date scheduled.

25.     In the event parole is not granted, the 1987 Guidelines provide for a rehearing in one year for prisoners serving a maximum sentence greater than five years.

26.     The 1987 Guidelines do not account for mental illness, disability, or incapacity in any way.

## MR. BANNISTER'S MENTAL ILLNESSES AND COGNITIVE IMPAIRMENTS

27.     Mr. Bannister has long suffered from paranoid schizophrenia and has received mental health treatment for it.  As recently as June 2017, the Bureau of Prisons identified Mr. Bannister's "significant mental health issues" and classified him "as a mental health care level 4."  Level 4 is the highest and most severe mental health designation in the federal prison system, reserved for individuals with chronic mental health conditions resulting in severe impairments to cognitive functioning.

28.     Schizophrenia is a common but serious mental illness that has a tendency to affect a person's thoughts, feelings, mood and overall functioning.  Symptoms of schizophrenia can include hallucinations, strange beliefs, agitated body movement, social withdrawal, difficulty paying attention, and problems with short-term memory.

29.     Mr. Bannister has had a long documented history of mental illness (including schizophrenia), a history that predates his current incarceration.  He was hospitalized at St. Elizabeth's Hospital in Washington, D.C. in 1997 after experiencing command auditory hallucinations at the age of 18.  Mr. Bannister's first criminal offenses started to occur around the same time, with the relevant offenses occurring after hospitalization.

30.     Mr. Bannister was incarcerated shortly thereafter in 1999.  Prior to his current placement at FMC Devens, Mr. Bannister reportedly suffered from psychosis that was "too severe" for him to be housed in a federal prison's general population.

31.     Mr. Bannister's current placement at FMC Devens began on October 24, 2004. Mr. Bannister receives medication for his mental illness.  When he takes his medication as prescribed, Mr. Bannister is reported as having a "bright affect, euthymic mood, and friendly interaction style."  And between June 2006 and May 2008, Mr. Bannister had "maintained improvements in his psychotic symptoms, behavior, and functioning."

32.     In May 2008, however, Mr. Bannister suffered a relapse and began suffering from auditory hallucinations and paranoid delusions.  Over the next three years, Mr. Bannister's levels of mental functioning declined, exacerbated by the Commission's denials of his parole applications in 2010 and 2011.

33.     The Bureau of Prisons has recognized that Mr. Bannister would be capable of "functioning in the community" were he to be placed in "a mental health group facility with psychiatric and mental health services."

34.     There is a documented, causal link between Mr. Bannister's outbursts, for which he has historically been subjected to disciplinary action, and Mr. Bannister's mental disability.

35.     Continued incarceration has only exacerbated Mr. Bannister's mental disability.

36.     In addition to his mental disability, Mr. Bannister also has an intellectual disability.  This disability makes certain programming that the Commission has deemed necessary for parole impossible for Mr. Bannister to accomplish due to his limited intellectual capacity.

37.     Mr. Bannister also suffers from attention-deficit hyperactivity disorder (ADHD), a learning disability that makes it difficult for him to focus on certain programming and educational classes.  Mr. Bannister's psychiatrist, Dr. Batool Kazim, testified at Mr. Bannister's 2015 parole hearing that the medication Mr. Bannister needs for his ADHD is not available for federal prisoners.

## THE COMMISSION REPEATEDLY DENIES MR. BANNISTER PAROLE BECAUSE OF HIS MENTAL AND INTELLECTUAL DISABILITIES

*2004 Parole Hearing*

38.     Mr. Bannister attended his first parole hearing in April 2004, during which he earned a Base Point Score of 3.  The Commission denied parole.  Under the 1987 Guidelines, "if parole is denied at a given hearing, the timing of the next rehearing becomes critical because the inmate's total point score may be improved, and may call for parole to be granted at the next hearing."  Exhibit A at 70-71.  The 1987 Guidelines called for a rehearing after one year.

39.     Instead of applying the 1987 Guidelines, the Commission, consistent with its policy at the time, followed its own 2000 United States Parole Commission Guidelines (the "Federal Guidelines") during Mr. Bannister's April 2004 parole hearing.  Under the Federal Guidelines, the Commission ordered Mr. Bannister's parole rehearing to take place in 2007— three years later, and two years after a rehearing should have occurred under the 1987 Guidelines.

40.     The Federal Guidelines use harsher standards to determine suitability for parole and impose longer waiting periods between rehearings than the 1987 Guidelines.  The Federal Guidelines, for example, contain a more stringent standard for program achievement by requiring "Superior Program Achievement" rather than "sustained program achievements" as required by the 1987 Guidelines.  Similarly, the standard set-off period under the Federal Guidelines is three years, compared with one year under the 1987 Guidelines.

41.     In *Sellmon v. Reilly*, 551 F. Supp. 2d 66 (D.D.C. 2008), this Court held that prisoners convicted under the D.C. Code for violations occurring before August 5, 1998 should be evaluated under the 1987 Guidelines.  Like other D.C. prisoners, Mr. Bannister did not receive a parole hearing under the 1987 Guidelines until 2010.

*2007 Parole Rehearing*

42.     In June 2007, Mr. Bannister had his second parole hearing, during which the Commission again denied parole using the Federal Guidelines, and scheduled a rehearing for 2010.

43.     In January 2010, following the *Sellmon* decision and subsequent rulemaking, the Commission issued a memorandum reviewing Mr. Bannister's 2004 and 2007 hearings and assessing Mr. Bannister's Grid Score under the proper 1987 Guidelines.  The Commission concluded that Mr. Bannister would have earned a Base Point Score of 3 at his 2004 parole hearing.

44.     In 2007, the Commission determined that it would have added a point to Mr. Bannister's Grid Score for negative institutional behavior, even though Mr. Bannister's Mental Status Update reflects that his behavior resulted directly from symptoms of his mental

disability—paranoia, disorganized thoughts and behavior, agitation, pressured speech, and episodic hostility.

45.     The Commission also determined that, for his 2007 rehearing, Mr. Bannister "was not entitled to -1 for program achievement . . . <u>as a result</u> [of his being] medically unassigned and therefore unable to work or program, due to diagnosis with schizophrenia, paranoid type A, personality disorder, alcohol abuse, cannabis abuse, PCP abuse, borderline intellectual functioning, and hepatitis B."  Memorandum, January 25, 2010 ("**<u>Exhibit B</u>**") at 1-2 (emphasis added).  Thus, the Commission assigned Mr. Bannister a Grid Score of 4 going into his 2010 parole rehearing.

46.     The Commission's decisionmaking demonstrates that Mr. Bannister's continued inability to obtain parole resulted from his mental disability—the Commission added a point for behavior directly linked to his disability, making it more difficult to obtain parole, and denied him a point reduction for programing achievement *only as a result* of his disability.

*2010 Parole Rehearing*

47.     In February 2010, on his next rehearing, Mr. Bannister received his first parole hearing under the appropriate 1987 Guidelines.

48.     Mr. Bannister had not received any disciplinary infractions in the three-year period since his last parole hearing in June 2007—a significant improvement from the previous three-year period—so no point was added.

49.     But no point was subtracted, either.  Although the Notice of Action gave no explanation of what was required for sustained program achievement, the Commission's accompanying memorandum explained that the program point reduction was withheld because

Mr. Bannister "continues to be medically unassigned, and has no new programming or work since the last hearing."  Exhibit B at 2.

50.     Put differently, but for his mental disability, Mr. Bannister could have received a one-point reduction, which would have put his Grid Score at a 3—within the guidelines for recommending parole.

51.     And had Mr. Bannister's applications for parole in 2007 been adjudged under the 1987 Guidelines, he would have had three one-year periods with no disciplinary violations and an opportunity to earn three one-point reductions for program achievement at parole hearings in 2008, 2009, and 2010.

*2011 Parole Rehearing*

52.     Mr. Bannister had another parole hearing in February 2011, during which he achieved a Grid Score of 3, which placed him within the 1987 Guidelines' recommendation that "Parole shall be granted at this rehearing."  Mr. Bannister had no disciplinary infractions and completed sustained programming, earning a one-point reduction.

53.     The hearing examiner, the only one who met personally with Mr. Bannister, recommended parole, specifically crediting the psychologist's conclusion that Mr. Bannister "could function in a group home environment with the proper guidance."  2011 Hearing Summary ("**Exhibit C**") at 3.

54.     Even though Mr. Bannister had no disciplinary infractions in the prior *four years* and demonstrated sustained programming achievement, the Commission ignored the parole examiner's recommendation and departed upward from the guidelines, denying parole directly on the basis of his having a mental disability.

55.    The 2011 Notice of Action specifically explained that the decision to deny parole was based on Mr. Bannister's mental disability: "your mental illness and inability to function in an open setting makes you a more serious risk if released." *Id.* at 4.

56.    But the staff psychologist who evaluated Mr. Bannister testified at the hearing that Mr. Bannister would be suitable for a group home placement, thus suggesting that he was capable of living in the community at large—a placement he would have secured.

57.    Commissioner Lynne Jenkins stated at that time, "I believe the real issue in this case is the subject's mental illness.  He is diagnosed as paranoid schizophrenic." *Id.*  By this reasoning, Mr. Bannister will never be granted parole so long as he has this disability.

58.    The Commission's other reasons for denial of parole in 2011 made little sense.  It cited negative institutional behavior, despite four years of incident-free behavior, and identified the lack of programming despite the examiner's decision to award a point reduction specifically for sustained programming.  This programming achievement included participation in a motivational group, a lunch time group, and weekly mental health groups.

59.    Making reference to the 2011 decision, the hearing examiner at his 2013 rehearing even noted that "the Commission chose to depart from the guidelines [in the 2011 decision] due to the subject's poor institutional adjustment and mental health instability."  2013 Rehearing Assessment ("**Exhibit D**") at 3.

60.    The Commission further departed from the Guidelines in 2011 by issuing a two-year setoff period instead of the standard one-year period.  Such a departure was not warranted and cannot be explained.  Mr. Bannister's good behavior and programming achievement warranted a rehearing the following year.  The only explanation—one provided by the Commission itself—is that the departure was based on Mr. Bannister's mental disability.

61.     The Commission denied Mr. Bannister the opportunity for parole in 2011 because of his mental and cognitive disabilities.

*2013 Parole Rehearing*

62.     Two years later in 2013, Mr. Bannister had another parole rehearing, during which the Commission assessed a point for disciplinary infractions, despite noting that Mr. Bannister had suffered a serious relapse into the symptoms of his mental disability and that his alleged disciplinary infractions were the result of his mental disability.

63.     The hearing examiner stated that Mr. Bannister "is severely mentally ill and has recently demonstrated paranoid behavior and a disorganized thought process."  Exhibit D at 4.

64.     The Commission also withheld a programming point reduction because Mr. Bannister "was not assigned a work assignment due to his confinement in SHU."  Exhibit D at 3.

65.     Mr. Bannister resided in the Special Housing Unit (SHU) for reasons caused by his mental disability.

66.     The Commission denied Mr. Bannister the opportunity for parole in 2013 because of his mental and cognitive disabilities.

*2015 Parole Rehearing*

67.     Mr. Bannister appeared again for a parole rehearing in August 2015.  Similar to the 2011 rehearing, and despite his mental disabilities, Mr. Bannister made considerable efforts to meet the requirements under the 1987 Guidelines, including receiving no disciplinary convictions and showing sustained programming achievement.  But the Commission again denied parole for Mr. Bannister.

68.     Mr. Bannister was assessed zero points for negative institutional behavior because he had not been found responsible for any disciplinary infractions since his last hearing.

69.     Despite completing sustained programming, such as participating in an anger management program recommended by a previous hearing examiner, psychological group counseling, a lunch group organized by the facility, and a weekly mental health support group, the Commission refused to credit him a point on his Grid Score for sustained programming.

70.     The only explanation for withholding the programming point reduction—also the reason given for denying parole and departing upward for a two-year hearing setoff—was that Mr. Bannister did not complete the victim impact course or complete a General Educational Development (GED) course.

71.     But Mr. Bannister's case manager confirmed at the 2015 rehearing that a victim impact course had not been offered at FMC Devens for at least two years.

72.     And in 2011, the hearing examiner noted that Mr. Bannister "has been exempt from taking the GED, due to his mental health issues."  Exhibit C at 2.  Had the point reduction been properly awarded, Mr. Bannister would have a Grid Score of 3, again within the 1987 Guidelines range for parole.

73.     The requirement to obtain a GED, despite the Commission's prior acknowledgement that "he is exempt . . . due to his mental health issues" points to another instance in which the Commission denied parole due to Mr. Bannister's disabilities.

74.     In addition to the mental disability, Mr. Bannister's intellectual disability (ADHD and low IQ score) also made it impossible for Mr. Bannister to obtain a GED degree.  At the hearing, Mr. Bannister's psychiatrist explained that Mr. Bannister may never be able to make progress toward completion of his GED while incarcerated because his mental health and intellectual disabilities make it very difficult for him to participate in traditional education courses.

75.     The Commission denied Mr. Bannister the opportunity for parole in 2015 because of his mental and cognitive disabilities.

76.     As in prior hearings, the Commission also departed upward by issuing a two-year setoff period between parole hearings without providing any reasonable justification.

77.     Not coincidentally, in the wake of the Commission's denial of parole and his continued incarceration, Mr. Bannister suffered a relapse into the symptoms of his mental disability.

*2017 Parole Rehearing*

78.     Most recently, Mr. Bannister requested a parole hearing scheduled for July 2017. Several weeks before the hearing, Mr. Bannister submitted a letter to the Commission requesting accommodations under the Rehabilitation Act.  (A true and correct copy of the letter is attached as **Exhibit E**.)  Consistent with the Act, Mr. Bannister asked that the Commission not consider his disability or related symptoms as a negative factor in its parole determination.  The Commission never responded to this request.

79.     Mr. Bannister, through counsel, again requested accommodations under the Rehabilitation Act at his parole rehearing.

80.     Much like its past failures to accommodate his mental and intellectual disabilities, the Commission once again added a point to Mr. Bannister's Grid Score for negative institutional behavior caused by his mental and intellectual disabilities.

81.     The Commission also failed to provide a point reduction when Mr. Bannister engaged in programming activity even though the hearing examiner recognized that Mr. Bannister "has significant mental health issues, which interfere with his institutional adjustment

and perhaps ability to maintain a job assignment and participate in programs."  2017 Parole

Rehearing Summary ("**Exhibit F**") at 4.

82.     The Commission also departed from the 1987 Guidelines by issuing a three-year

setoff period between parole hearings even though the Commission's concerns directly stem

from Mr. Bannister's mental disability.

83.     The Commission's most recent decision in 2017 all but conceded that the

Commission will never grant Mr. Bannister parole.  It stated that, given Mr. Bannister's mental

illness and cognitive impairments, "[i]t is doubtful the subject will ever achieve a paroleable

Grid Point Score."  *Id.* at 4.

84.     The Commission denied Mr. Bannister the opportunity for parole in 2017 because

of his mental and cognitive disabilities.

### THE 1987 D.C. GUIDELINES, BOTH FACIALLY AND AS APPLIED BY THE COMMISSION, ILLEGALLY FAIL TO ACCOMMODATE PERSONS SUFFERING FROM MENTAL AND INTELLECTUAL DISABILITIES

85.     The Commission's application of the 1987 Guidelines violates federal law,

including the Rehabilitation Act of 1973, because the Commission has failed to make reasonable

accommodation for people with mental or intellectual disabilities.

86.     The Commission's parole decisions are based on its application of the Guidelines,

which themselves do not include any express provisions to accommodate an individual's

disabilities as required under federal law.

87.     The Guidelines also do not contain any prohibition against or guidance around

raising Grid Scores or denying parole based on the symptoms of an individual's disabilities.

88.     Rather, the Guidelines formulaically instruct the Commission to consider an

individual's disciplinary record and programming activity since the last parole hearing to

calculate a "Grid Score" from 0 to 5.  If the Grid Score is 3 or below, the Guidelines recommend granting parole—a Grid Score of 4 or 5 suggests parole should be denied.

89.     The Guidelines, both on their face and as applied by the Commission, do not account for the fact that an individual's mental or intellectual disabilities, such as an illness like paranoid schizophrenia or a low IQ score, can directly result in being cited for what is considered negative disciplinary behavior.  In such instances, the behavior is actually a symptom of a mental or intellectual disability.

90.     Among other adverse effects, mental and intellectual disabilities can make it more difficult for a person to fully comprehend the rules to which they are being evaluated or to control their behavior to conform to these rules, especially in a strict, confined environment.

91.     Mental and intellectual disabilities can also lead to a higher instance of confrontations with other people, including other prisoners.

92.     Given these challenges, individuals with a mental or intellectual disability are more likely to receive an increased Grid Score due to institutional behavior—sometimes through no fault of their own.

93.     This is true for Mr. Bannister.  His recent Progress Report notes that Mr. Bannister "displays poor social skills due to his mental health condition."  The disciplinary incidents contained in the Progress Report all involved or stemmed from his social interactions with other prisoners or staff.

94.     While a prisoner's disciplinary record may ordinarily be reflective of his or her willingness to conform his or her conduct to societal norms, Mr. Bannister's record reflects symptoms of his disabilities.

95.     An individual's mental or intellectual disability can directly affect an individual's ability to complete programming or the level at which the person can complete programing.  As a result, individuals with a mental or intellectual disability are less likely to receive a point reduction on their Grid Scores for sustained programming activity.

96.     This is true for Mr. Bannister.  His recent Progress Report states that Mr. Bannister "has been unassigned from work since his last parole hearing, due to his mental health condition" and "has not participated in any documented classes" for his GED.  The clear implication is that Mr. Bannister would be working or participating in GED classes but for his disabilities.  But due to his disabilities, Mr. Bannister is unable to engage in these activities and is therefore found by the Commission to be ineligible for parole.

97.     Requiring the completion of specific programs as a condition for parole, such as obtaining a GED degree, can further discriminate against persons with a mental or intellectual disability.

98.     The Commission has effectively made obtaining his GED a condition of parole for Mr. Bannister even though he suffers from an intellectual disability and staff psychologists have stated that Mr. Bannister may never be able to complete a GED, especially without proper medication, which is unavailable to individuals incarcerated in the federal Bureau of Prisons.

99.     The symptoms of Mr. Bannister's mental and intellectual disabilities make it effectively impossible for him to meet the same standards for sustained programming as required of prisoners without a disability or to meet programming goals that may be appropriate for prisoners without a disability.

100.    Symptoms of a disability can also result in other adverse factors, such as confinement in a Special Housing Unit, which can significantly reduce opportunities for parole.

101.    Placement in a Special Housing Unit due to disability may, for example, require the prisoner to follow a stricter set of rules or subject the individual to higher scrutiny, both of which would make citations for negative institutional behavior more common.

102.    On the other hand, there are limited "leisure programs" and no work assignments for someone housed in a secure mental health unit, meaning that the individual has few, if any, opportunities to lower his or her Grid Score through sustained programing achievement.

103.    This is true for Mr. Bannister.  His recent Progress Report stated that Mr. Bannister "has participated in minimal leisure programs . . . while housed in the N1 secure mental health unit."

104.    Specific programs, which the Commission sometimes imposes as a conditions for parole, may not be available due to placement of prisoners with mental or intellectual disabilities.

105.    Basing a decision to extend the set-off period on factors rooted in a mental or intellectual disability or illness, as the Commission did repeatedly here, also discriminates against those suffering from mental and intellectual disabilities.

106.    The 1987 Guidelines as applied by the Commission do not prohibit the Commission from raising Grid Scores or denying parole based on the symptoms of a mental or intellectual disability.

107.    The 1987 Guidelines as applied by the Commission do not provide any means for persons with a mental or intellectual disability to request an accommodation.

108.    Insofar as the 1987 Guidelines do not provide an accommodation for those with mental or intellectual disabilities, and because the Commission has failed to adjust those Guidelines for people with disabilities, their application by the Commission violates federal law, including the Rehabilitation Act of 1973.

## FIRST CLAIM FOR RELIEF:
### (Violation of the Rehabilitation Act, 29 U.S.C. § 794)

109.    The allegations contained in Paragraphs 1 through 108 above are incorporated herein.

110.    Mr. Bannister is an individual who suffers from a mental disability in the form of paranoid schizophrenia and documented intellectual disability in the form of cognitive impairments.

111.    Mr. Bannister is otherwise qualified or would be qualified for parole if the Commission makes reasonable accommodations to account for Mr. Bannister's mental and intellectual disabilities.

112.    The 1987 Guidelines do not provide an accommodation, or any means to request an accommodation, for those with mental or intellectual disabilities.

113.    The 1987 Guidelines do not explicitly prohibit discrimination based on mental or intellectual disability.

114.    The Commission has refused to make such modifications in its application of the 1987 Guidelines to accommodate people with disabilities.

115.    The Commission has failed to accommodate Mr. Bannister's disabilities in assessing his suitability for parole under the relevant Guidelines or adjust the Guidelines for people like Mr. Bannister with significant disabilities.

116.    Mr. Bannister was excluded from parole solely by reason of his disabilities.

117.    Mr. Bannister is otherwise qualified or would be qualified for a standard one-year setoff for redetermination of parole suitability if the Commission makes reasonable accommodations to account for Mr. Bannister's mental disability or intellectual disability.

118.    The Commission has refused to make such modifications or accommodations.

119.     Mr. Bannister has been excluded from the standard one-year set-off solely by reason of his disability.

120.     The Commission is an "Executive agency" that receives federal financial assistance, within the meaning of 29 U.S.C. § 794.

121.     The Commission's refusal to provide modifications or accommodations—both in its process for granting parole and in its process for determining an appropriate set-off period—constitutes discrimination against Mr. Bannister, who suffers from mental and intellectual disabilities, in violation of the Rehabilitation Act of 1973.

## PRAYER FOR RELIEF

Based on the foregoing, Mr. Bannister requests the following relief:

1.     A declaration that the 1987 Guidelines violate the Rehabilitation Act of 1973 because those Guidelines fail to provide accommodations to individuals who suffer from mental and intellectual disabilities.

2.     A declaration that the 1987 Guidelines, as applied by the Commission, violate the Rehabilitation Act of 1973 because the Commission fails to provide accommodations to individuals who suffer from mental and intellectual disabilities.

3.     A declaration that the Commission, in failing to provide reasonable accommodations for mental and intellectual disabilities, has applied the 1987 Guidelines in a discriminatory manner in violation of the Rehabilitation Act of 1973.

4.     A declaration that the Commission's failure to provide accommodations for mental and intellectual disabilities in determining the appropriate set-off period for parole applicants violates the Rehabilitation Act of 1973.

5.      A declaration that the Commission's failure to provide accommodations for Mr. Bannister's mental and intellectual disabilities violates the Rehabilitation Act of 1973.

6.      Issuance of a mandatory permanent injunction requiring the Commission to adopt accommodations to its 1987 Guidelines that would take into proper account a parole applicant's mental and intellectual disabilities, whether the capacity to achieve mitigating factors or the exacerbation of aggravating factors have been affected by such disabilities, and whether such disabilities can be successfully mitigated upon release.

7.      Issuance of a mandatory permanent injunction requiring the Commission to hold a parole rehearing for Mr. Bannister as soon as practicable, in a manner that takes into account and accommodates Mr. Bannister's mental and intellectual disabilities.

8.      Award of Mr. Bannister's reasonable attorneys' fees and costs, as provided by law; and

9.      Such other legal and equitable relief as the Court may deem Mr. Bannister is entitled to receive.

Dated: June 13, 2018                    Respectfully submitted,

                                         _/s/ Justin C. Pierce_____
                                        Thomas M. Hefferon (D.C. Bar. No. 461750)
                                        Andrew Kim (D.C. Bar No. 1029348)
                                        Justin C. Pierce (D.C. Bar No. 1045849)
                                        Andrew J. Bastnagel (*pro hac vice* application pending)
                                        GOODWIN PROCTER LLP
                                        901 New York Avenue
                                        Washington, D.C. 20001
                                        Phone: (202) 346-4000
                                        Fax: (202) 346-4444

                                        Philip Fornaci (D.C. Bar No. 434824)
                                        WASHINGTON LAWYERS' COMMITTEE
                                        11 Dupont Circle, N.W., Suite 400
                                        Washington, D.C. 20036
                                        Phone: (202) 319-1000
                                        Fax: (203) 319-1010

                                        *Counsel for Plaintiff Markist Bannister*